**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID BRILL | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| OFC. MADISYN EINFALT #477, *et al* | : | No. 24-00644 |
| Defendants. | : | |
| | : | |

**<u>Memorandum Opinion</u>**

**PAMELA A. CARLOS**                                                                    **July 14, 2025**
**U.S. MAGISTRATE JUDGE**

Plaintiff David Brill ("Mr. Brill") and his son Karl were arrested on February 13, 2022 while on the premises of the Wind Creek Bethlehem Hotel and Casino. Following his arrest, Mr. Brill pled guilty to a charge of disorderly conduct and was required to undergo anger management counseling. Now, pursuant to the instant lawsuit, Mr. Brill alleges that Officer Robert Constable ("Officer Constable") and Officer Jeremy Banks ("Officer Banks") (collectively, the "Defendant Officers") used excessive force in effectuating his arrest in violation of 42 U.S.C. Section 1983. He further alleges that these officers, together with security personnel from Wind Creek Bethlehem, LLC and Wind Creek Realty, LLC (collectively, "Wind Creek"), assaulted and battered him during the arrest thereby causing him serious mental and physical injuries.

Presently before the Court are two motions for summary judgment, one filed by Wind Creek, *see* Doc. No. 54, and one filed by the Defendant Officers, *see* Doc. Nos. 55, 56. As might be expected, Plaintiff and the Defendants offer starkly contrasting accounts of what transpired during the arrest. However, in this instance—where there is videotape footage from three body-worn cameras, together with surveillance footage from the casino—there is little room for dispute. As explained below, Defendants' motions are granted and the matter is dismissed with prejudice.

## I.    BACKGROUND

### A.  Relevant Factual Background

On February 13, 2022, Mike Heredia was a registered guest at the Wind Creek Bethlehem Hotel and Casino, and he invited Plaintiff and his adult son, Karl, to stay with him. *See* Doc. Nos. 55 and 59 at ¶ 1; Doc. Nos. 54 and 57 at ¶ 2. Plaintiff and Karl watched the first half of the Super Bowl at a sports bar located at the casino. *See* Doc. Nos. 55 and 59 at ¶ 2. Later that evening, Karl returned to the sports bar without Plaintiff and attempted to order additional drinks, but was denied by one of the bartenders. *See* Doc. Nos. 55 and 59 at ¶ 4; Doc. Nos. 54 and 57 at ¶ 5. Karl called the bartender a "fucking pussy" and walked away. *See* Doc. Nos. 55 and 59 at ¶ 4; Doc. Nos. 54 and 57 at ¶ 6.  He returned approximately thirty minutes later and called the bartender a "fucking faggot." *See* Doc. Nos. 55 and 59 at ¶ 5. When a security supervisor for the casino approached Karl about this behavior, Karl stated, "what did you call your boyfriend on me you fucking faggot motherfucker." *See id.* at ¶ 6. Karl continued to make several threatening hand gestures and danced around the halls of the hotel. *See* Doc. No. 59 at ¶ 7; Doc. Nos. 54 and 57 at ¶ 9. When he returned to the casino entrance, Karl was denied entry. *See* Doc. Nos. 55 and 59 at ¶ 8.

Although Plaintiff denies that Karl was ejected from the hotel, there is no dispute that at some point the Bethlehem Police Department was called. *See* Doc. Nos. 55 and 59 at ¶ 9. Officer Madisyn Einfalt ("Officer Einfalt"),[1] Officer Banks, and Officer Constable responded to the scene and made contact with Wind Creek Security Supervisor, Thomas Bear ("Mr. Bear"). *See* Doc. Nos. 55 and 59 at ¶ 11. All three officers had body-worn cameras, which were on during the pertinent events, and which also captured audio. *See* Doc. No. 55 (Exhibits H, J, and K); Doc. Nos. 54 and

---

[1]    On July 10, 2025, the Parties filed a Stipulation of Partial Voluntary Dismissal. *See* Doc. No. 64. All claims against Defendant, Officer Madisyn Einfalt were voluntarily dismissed with prejudice in their entirety. *See id.* Moreover, any and all claims in the Complaint alleging negligence against the Wind Creek Defendants were voluntarily dismissed with prejudice. *See id.*

57 at ¶ 17. Mr. Bear notified the officers that an individual named Karl Brill was intoxicated and that he refused to leave, made several homophobic slurs, and acted in a threatening manner. *See* Doc. Nos. 55 and 59 at ¶ 12. Mr. Bear, together with the officers, encountered both Karl and Plaintiff by the elevator banks of the hotel. *See* Doc. No. 59 at ¶ 13. Other hotel patrons can be seen within the vicinity of the elevator banks in the pertinent video footage. Officer Einfalt, as the lead responding officer, approached Karl to investigate the situation and gather basic identifying information. *See* Doc. Nos. 55 and 59 at ¶ 15. The responding officers smelled alcohol on Karl and Plaintiff's breath and observed outward signs of intoxication. *See* Doc. No. 55 at ¶ 16.[2]

As Officer Einfalt spoke with Karl, Plaintiff pointed his finger in his son's face and told him to "shut the hell up … don't say a fucking word." *See* Doc. Nos. 55 and 59 at ¶ 17. Officer Banks then asked Plaintiff, "do you want to come over here," and Plaintiff and Officer Banks briefly stepped away from Karl and Officer Einfalt. *See* Doc. Nos. 55 and 59 at ¶ 18. Officer Banks attempted to get basic information from Plaintiff, such as his name, but Plaintiff immediately walked away and again approached his son and Officer Einfalt. *See* Doc. Nos. 55 and 59 at ¶ 19. Officer Einfalt continued her unsuccessful attempts to get basic information from Karl. *See* Doc. Nos. 55 and 59 at ¶ 20.

The officers' body-worn camera footage confirms that Plaintiff stood between the responding officers and Karl and frequently directed his son not to respond to the officers' basic questions *See* Doc. No. 55-9 (Exhibit H, Officer Constable's Body Worn Camera Footage) at 20:28:00 to 20:28:24.[3] Karl continued to act in an antagonistic manner, and at one point pointed

---

[2]    Plaintiff denies that he smelled of alcohol or displayed signs of intoxication. *See* Doc. No. 59 at ¶ 16. However, following his arrest, he was taken to the St. Luke's University Hospital Emergency Department, and the notes of his visit confirm that his breath alcohol in the field was 0.13, and his lab results showed a breath alcohol value of 0.123. *See* Doc. 55-14 at 3, 7

[3]    Time references are displayed in the top right corner of each recording from the body worn camera footage.

toward Mr. Bear and Officer Banks and stated, "I pissed off his boyfriend," while making lewd hand gestures. *See* Doc. Nos. 55 and 59 at ¶ 24. Officer Einfalt calmly tried to confirm the spelling of Karl's name, at which point Plaintiff again pointed his finger in Karl's face and said, "don't speak a word, you listen to me!" *See* Doc. Nos. 55 and 59 at ¶ 25. Officer Banks turned to Mr. Bear and asked if Wind Creek wanted Karl arrested for trespass, and Mr. Bear responded, "yes." *See* Doc. Nos. 55 and 59 at ¶ 26.

The resulting struggle between Plaintiff, his son, and the responding officers forms the basis of Plaintiff's Complaint. Although there is video footage from several vantage points, the Parties offer vastly different accounts of what transpired. *See* Doc. Nos. 55 and 59 at ¶¶ 27-35. From Officer Constable's view, the camera footage shows Officer Banks approach Karl as he attempted to place him under arrest:



*See* Doc. No. 55-9 at 20:28:21.[4] From Officer Banks' perspective, the video shows that when Officer Banks approaches Karl, Plaintiff sticks his arm out in between Officer Banks and his son:

---

[4]    This screenshot is from Officer Constable's body-worn camera. Plaintiff is wearing a blue shirt and a hat. Officer Einfalt is on the left, whereas Officer Banks is on the right. Karl, who is not in view, is standing behind Plaintiff and between Officers Einfalt and Banks.



*See* Doc. No. 55-12 (Exhibit K, Officer Banks' Body Worn Camera Footage) at 20:28:21.[5] Officer Banks responds by pushing Plaintiff and shouting "get away." *See id.* at 20:28:21 to 20:28:24. Officer Constable immediately grabs Plaintiff from behind and pulls him away from Officers Einfalt and Banks. *See id.* Via the audio captured on Officer Constable's body worn camera, Plaintiff is told to place his hands behind his back. *See* 55-9 at 20:28:25 to 20:28:28. Officer Banks diverts his focus from arresting Karl to Plaintiff, and he, together with Officer Constable and Mr. Bear, bring Plaintiff to the ground. *See* Doc. No. 55-12 at 20:28:28 to 20:28:38.

The clearest vantage point of Plaintiff's arrest is captured on the casino's surveillance footage. *See* Doc. No. 54-10 (Exhibit G, Wind Creek Surveillance Footage) at 20:28:20 to 20:28:39. As Officer Banks approaches to place Karl under arrest, video footage shows Karl turn around and place his hands behind his back in what appears to be a mocking gesture. While this happens, Plaintiff does not step away from his son or any of the officers, and instead stares directly at Officer Banks while in very close proximity:

---

[5] The Defendant Officers suggest Plaintiff reached out and grabbed Officer Banks' left arm, *see* Doc. No. 55 at ¶ 28, whereas Plaintiff denies that he made any contact with Officer Banks or that if he did, it was minimal and accidental and not an attempt to grab his arm or interfere with the arrest. *See* Doc. No. 59 at ¶ 28.



*See id.* at 20:28:22. Officer Constable begins approaching Plaintiff from behind. *See id.* Once Officer Banks pushes Plaintiff, Officer Constable immediately pulls him toward the opposite elevator bank. *See id.* at 20:28:24. At this point, Officer Constable alone struggles to handcuff Plaintiff over the course of at least five seconds before Mr. Bear begins to assist:



*See id.* at 20:28:24 to 20:28:31.[6] Between Mr. Bear, Officer Constable, and eventually Officer Banks, Plaintiff is brought to the ground. *See id.* During this struggle, Plaintiff did not voluntarily put his hands behind his back.[7]

 While the officers engaged his father, Karl continuously shouted and called them "pussies," until he too was subdued. *See id.* at 20:28:28 to 20:29:30. During the officers' scuffle with Karl, surveillance footage from the casino shows Karl actively resisting arrest and kicking his foot in the air in the officers' direction:



*See* Doc. No. 54-10 at 20:29:16. Indeed, Officer Constable drew his taser to Karl's stomach and threatened to tase Karl if he did not stop resisting arrest. *See* Doc. No. 55-9 at 20:29:15 to 20:29:20.

 Once in custody, Officer Banks and Mr. Bear helped Plaintiff sit an upright position. *See* Doc. Nos. 55 and 59 at ¶ 36. In this position, Plaintiff can be heard saying, "I'm good," as he was being moved. *See id.* Because Plaintiff had an open laceration on his face, the Defendant Officers

---

[6]     This screenshot comes from the casino's surveillance footage. Plaintiff is engaged in a struggle with Officer Constable, and Officer Banks is looking in the direction of Plaintiff and Officer Constable. Officer Einfalt is standing in front of Karl, who is seen in the bottom right wearing a black hat. Mr. Bear is seen at the bottom-left of the frame.

[7]     Plaintiff consistently denies that he resisted arrest and contends that he could not possibly comply with any purported orders because he was being pulled in opposing directions. *See* Doc. No. 59 at ¶ 31. He contends that he did not need to be subdued. *See id.*  at ¶ 32.

called an ambulance for him. *See* Doc. Nos. 55 and 59 at ¶ 37. However, he stated, "I don't want an ambulance." *See id.* Nevertheless, he was taken to St. Luke's Hospital for treatment. *See* Doc. Nos. 55 and 59 at ¶ 40. Following this incident, Plaintiff pled guilty to 18 § 5503(A)(4), Disorderly Conduct. *See* Doc. Nos. 55 and 59 at ¶ 38.[8] He was thereafter required to undergo anger management consulting as a result of the incident. *See* Doc. Nos. 55 and 59 at ¶ 38.

During his deposition, Mr. Bear testified that he believed Plaintiff was resisting arrest because he was not letting the responding officers detain him. *See* 54-9 (Exhibit F) at 9. Mr. Bear explained that he chose to assist the officers "so they could then assist with the other family member, Karl Brill as well." *See id.* Mr. Bear confirmed that although the officers never explicitly asked him to help, he "assisted so no one else would further get injured." *See id.* at 10. He explained, "[m]y job there was just to make sure everyone was safe. If the officer was by himself it could have led to further, to someone getting injured." *See id.*

During Officer Constable's deposition, he agreed that Plaintiff's resistance necessitated Mr. Bear's participation. *See* Doc. No. 54-13 (Exhibit J) at 4. He explained that Officer Banks's and Mr. Bear's assistance, together with his own force, was required to subdue and restrain Plaintiff. *See id.* Indeed, he was thankful that Mr. Bear was present on the scene to help the responding officers gain control of both Plaintiff and his son. *See id.*

### B. Procedural History

On February 13, 2024, Plaintiff initiated this lawsuit alleging a Section 1983 claim of excessive force against the Defendant Officers (Count I), assault and battery against all Defendants

---

[8]    Plaintiff denies Defendants' characterization of his plea deal, explaining that he accepted a plea deal for disorderly conduct for "creating a hazardous or physically offensive condition by which any act which serves no legitimate purpose of the actor." *See* Doc. Nos 59 at ¶ 38. He explained that he was not convicted of engaging in fighting, assault on police, or resisting arrest. *See id.*

(Count II), and negligence against Wind Creek (Count III). *See* Doc. No. 1.[9] On April 8, 2024, Wind Creek moved to dismiss the negligence claim and Plaintiff's claim for punitive damages, *see* Doc. No. 28, which was ultimately denied. *See* Doc. No. 37. The Defendant Officers and Wind Creek answered the complaint, denied all liability, and raised several affirmative defenses and cross-claims. *See* Doc. Nos. 31 and 38. On July 8, 2024, the Parties consented to jurisdiction by a U.S. Magistrate Judge, and the matter was reassigned to the undersigned for all remaining proceedings. *See* Doc. Nos. 40 and 42.

Following discovery, Wind Creek moved for summary judgment against Plaintiff on April 4, 2025. *See* Doc. No. 54. In relevant part, Wind Creek argued that Supervisor Thomas Bear's use of force was justifiable under the circumstances, and therefore Wind Creek is immune from liability pursuant to 18 Pa.C.S. § 506. *See* Doc. No. 54-1 at 3-7. Wind Creek explained that Mr. Bear reasonably and actually believed that the police department had a legal basis to effectuate Plaintiff's arrest and detainment, that he believed the use of force applied by the officers was justified and reasonable given Plaintiff's active resistance, and that he believed his intervention was necessary to protect the officers from physical harm. *See id.* at 5-6.

Several days later, on April 11, 2025, the Defendant Officers also moved for summary judgment seeking complete dismissal of the claims against them. *See* Doc. Nos. 55 and 56. Where, as here, there is videotape footage of the disputed actions, the Defendant Officers insist that the Court must view the facts as depicted by the video—not the "visible fiction" that is contained in Plaintiff's Complaint. *See id.* at 10 (citation omitted). In doing so, the Defendant Officers explained that the "reasonableness" of the force used to effectuate the arrest must be judged from

---

[9]     As noted above at footnote one, the Parties stipulated to the dismissal of the negligence claims against the Wind Creek Defendants. *See* Doc. No. 64.

the perspective of a reasonable officer on the scene, rather than with the benefit of hindsight. *See* Doc. No. 56 at 6 (citation omitted). In this case, the force used upon Plaintiff has two parts—first, the force used by Officer Banks and Officer Constable when Plaintiff attempted to prevent Karl's arrest, and second, the force used by the officers to secure and handcuff him. *See id.* at 7.  As to the first issue, the Defendant Officers argue the force used was for their own safety as Plaintiff physically grabbed Officer Banks while he was attempting to lawfully arrest his son. *See id.* at 9-10. And as to the second, the Defendant Officers argue the force used was reasonable because Plaintiff was actively resisting arrest after he attempted to interfere with the investigation. *See id.* at 10-11. Separately, the Defendant Officers argue that even if Plaintiff has set forth a viable claim, the officers should be afforded qualified immunity. *See id.* at 12-14.

On April 18 and April 25, respectively, Plaintiff filed response briefs in opposition to each motion. *See* Doc. Nos. 57 and 59. Plaintiff maintains that the reasonableness of force used by law enforcement is nearly always a question of fact for the jury—not something to be resolved on summary judgment. *See* Doc. No. 57-1 at 3 and Doc. No. 59-1 at 6. In this regard, Plaintiff argued there are several factual disputes, including whether Plaintiff made any physical contact with Officer Banks and whether he actively resisted his arrest. *See* Doc. No. 59-1 at 3-6. He argued further that the Defendant Officers are not entitled to qualified immunity because their underlying premise—i.e., that he actively resisted arrest and that he was merely pushed—is flawed. *See* Doc. No. 59-1 at 7-8. Finally, he argued that Wind Creek failed to assert immunity as an affirmative defense, and therefore any such argument is waived. *See* Doc. No. 57-1 at 5-6.

Wind Creek thereafter moved for, and was granted, an opportunity to file a Reply brief limited to addressing Plaintiff's waiver argument. *See* Doc. Nos. 58 and 62. In its Reply, Wind Creek explained that contrary to Plaintiff's claims, it was not required to plead its affirmative

defenses with "mathematical precision." *See* Doc. No. 64 at 3. All that is required is "fair notice" of the defense. *See id.* In this regard, the affirmative defenses articulated in the Twenty-First through Twenty-Fourth paragraphs of its Answer more than satisfactorily provided Plaintiff with notice of the defense now asserted in its summary judgment motion. *See id.* at 4.

The matter is now ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only in cases where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those that "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, the facts and evidence are viewed in "the light most favorable to the nonmoving party." *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

The moving party has the initial burden of showing an absence of a genuine dispute as to any material fact. *See Anderson*, 477 U.S. at 256. This includes any argument that there is no evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). After the movant has made this initial showing, the burden then shifts to the nonmoving party to demonstrate that there is sufficient evidence in the record that would support a jury verdict in their favor. *See id.* at 322–23. Importantly, speculation and conclusory allegations by the nonmoving party are not enough to defeat a summary judgment motion. *Razak, Inc.*, 951 F.3d at 144.

In cases such as these, where there is videotape footage of the relevant events, the Supreme Court has explained that the reviewing court must view the facts "in the light depicted by the

video." *Scott v. Harris*, 550 U.S. 372, 381 (2007). The Court further emphasized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. As one district court explained, "where critical events at issue have been captured on videotape, the Court is obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. *Breeland v. Cook*, No. 3:12-CV-2511, 2014 WL 820167, at *4 (M.D. Pa. Mar. 3, 2014).

## III.    DISCUSSION

### A.    Section 1983 Claim of Excessive Force

It is well-established that the "right to make an arrest … necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation omitted). But the use of force is not without limits and is confined to what may appropriately be regarded as "reasonable" under the circumstances. *See id.* at 395 (holding that "all claims that law enforcement officers have used excessive force—deadly or not— in the course of an arrest … of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). The question of "reasonableness" is not capable of precise definition or mechanical application. *See id.* at 396 (citation omitted). Instead, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted).

Crucially, [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted). In other words, "'[n]ot every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers,' … violates the Fourth Amendment." *Id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In their Motion for Summary Judgment, the Defendant Officers describe the use of force against Plaintiff as having two parts—first, the "pushing" and "pulling" used by the officers when Plaintiff intervened in the arrest of his son; and second, the force used by the officers to secure and handcuff Plaintiff after he began resisting his own arrest. *See* Doc. No. 56-1 at 7. Against this framework, the Defendant Officers then analyze each of the *Graham* factors and argue that they are entitled to summary judgment.

As it concerns the "severity of the crime at issue," the Defendant Officers concede that Plaintiff was not the suspect of the criminal investigation they were responding to, and that his ultimate offense was not a "terribly serious crime." *See id.* at 7-8. However, the Defendant Officers emphasize—and I agree—that "Plaintiff made an already bad situation created by his drunken and threatening son even worse." *See id.* at 7-8. Plaintiff does not dispute that his son, Karl, engaged in unruly and threatening behavior on Wind Creek premises before the Defendant Officers were called to the scene. Plaintiff also does not dispute that once the officers arrived, Karl continued to hurl insults in their direction and act in an antagonistic manner. Finally, the video footage confirms that Plaintiff continuously stood between the responding officers and his son and even directed his son not to respond to their questions, often shouting expletives in his direction. And to compound matters further, Plaintiff and his son were visibly intoxicated during this whole incident.[10]

---

[10]    Although Plaintiff denies that he smelled of alcohol or displayed signs of intoxication, *see* Doc. No. 59 at ¶ 16, there is no dispute that his son, Karl, was visibly intoxicated and combative. That much is clear in the videotape

As to the next factor—whether the Plaintiff posed an immediate threat to the safety of the officers or others—the Defendant Officers emphasize that when Plaintiff grabbed Officer Banks he created "an immediate threat to the safety of all three officers and Mr. Bear," and escalated the situation with his "clear showing of force and intimidation in an effort to prevent the Officers from lawfully arresting Karl." *See* Doc. No. 56-1 at 8. Because the officers had firearms, tasers, and other police tools on their gun belts, the Defendant Officers argue that Plaintiff or his son could have easily grabbed these weapons during the altercation. *See id.* Plaintiff, however, insists that he never "physically grabbed" Officer Banks, and the video evidence "does not show that Plaintiff made any physical contact" with him. *See* Doc. No. 59-1 at 4. Because this issue is inconclusive, Plaintiff maintains that summary judgment is not warranted. *See id.*

However, Plaintiff's repeated focus on the question of "physical contact" is misplaced. Plaintiff does not dispute that the entire altercation took place in the elevator banks of the Wind Creek premises, which was not closed off to public access. Indeed, the surveillance footage shows that several other Wind Creek patrons were within the vicinity of this altercation, and thus, were at risk of harm if the situation escalated beyond police control. *See* 55-9 at 20:24:32. Moreover, and as explained above, Plaintiff's son refused to cooperate with the police, Plaintiff himself directed him not to cooperate, and Plaintiff continuously stood in between his son and the Defendant Officers. Finally, video surveillance footage unequivocally demonstrates that when Officer Banks approached Karl to effect his arrest, Plaintiff made no attempt to walk away from the situation. Instead, Plaintiff turned in the officer's direction and reached his arm out between Officer Banks and his son. There is no dispute that Plaintiff was within very close proximity of

---

footage. Moreover, the medical reports from St. Luke's University Hospital Emergency Department confirm that Plaintiff's breath alcohol in the field was 0.13, and his lab results showed a breath alcohol value of 0.123. *See* Doc. 55-14 at 3, 7

Officer Banks and was well within arm's reach of the officer's weapons. Given the totality of the circumstances, and from the perspective of a reasonable officer at the scene, the surveillance footage demonstrates that Officer Banks made a reasonable, split-second judgment to push Plaintiff away. *Jones v. City of Jersey City*, 45 F. App'x 196, 198 (3d Cir. 2002) (quoting *Graham*, 490 U.S. at 396). ("It is axiomatic that '[n]ot every push or shove, even if it may later seem unnecessary,' violates the Constitution.") (quoting *Graham*, 490 U.S. at 396).[11]

Once Plaintiff was pushed away, the Defendant Officers turn to the next *Graham* factors and emphasize that Plaintiff began resisting Officer Constable's attempts to subdue him and that the duration of the force used was brief. *See* Doc. No. 56-1 at 8-9.  Again, Plaintiff disputes this characterization and argues that over the course of thirty seconds he was "never given the opportunity to place his hands behind his back because the Defendants [with Mr. Bear] were pushing pulling and slamming his body and head around." *See* Doc. No. 59-1 at 5. He emphasizes that "none of the videos depict Plaintiff wrestling with the officers, pushing the officers, kicking or punching the officers or actively resisting in any way." *See id.*

Plaintiff is correct that he did not appear to kick, punch, or strike the officers.[12] But one need not assault and batter a police officer to resist arrest, and Plaintiff's attempts to minimize his physical struggle is not supported by the video footage. Once Plaintiff was pulled toward the opposite elevator bank by Officer Constable, he was told to place his hands behind his back. *See* 55-9 at 20:28:25 to 20:28:28. For whatever reason, he does not. The surveillance footage then shows that over the course of five seconds, Officer Constable struggled to restrain Plaintiff, and

---

[11]    Plaintiff might not have intended to impede the arrest of his son. However, his intentions are not relevant. From the perspective of a reasonable officer on the scene, Plaintiff's movement to reach his arm between the officer and the arrestee posed a risk to the officer, thus warranting him being pushed away from the situation.

[12]    At the same time, the video footage also confirms that the Defendant Officers and Mr. Bear also did not punch, kick, or otherwise strike Plaintiff either. Rather, the Defendant Officers and Mr. Bear struggled with Plaintiff to pull his arms behind his back.

during this struggle Plaintiff never attempted to place his arms behind his back. Instead, he turned in Officer Constable's direction with his right arm free. It was not until Mr. Bear stepped in to assist were they able to secure both arms to ensure that Plaintiff could not strike the officer or grab the officer's weapons with his free hand. Seeing this, Officer Banks turned his attention from Karl in order to assist Officer Constable and Mr. Bear to bring Plaintiff to the ground. While on the ground, Plaintiff was again directed to place his hands behind his back, and he was eventually handcuffed. Contrary to Plaintiff's assertion that he did not "wrestle" with the officers, the video footage collectively shows a clear physical struggle. Again, from the perspective of a reasonable officer on to the scene, Plaintiff did not voluntarily place his hands behind his back and appeared to resist being arrested.

Because Plaintiff's arrest occupied the attention of the Defendant Officers and Mr. Bear, Officer Einfalt was left alone with Karl, who was now acting in an increasingly belligerent and threatening manner. On the body-worn camera footage, Karl can be heard shouting at the officers and calling them "pussies," while Officer Einfalt attempted to keep him away from Mr. Bear and the Defendant Officers. Eventually Officer Einfalt, together with Officer Constable, attempted to arrest Karl, but he actively shoved them away. *See* Doc. No. 54-10 at 20:28:45 to 20:28:55.[13] After a physical struggle, Karl fell to the floor, and Officer Einfalt and Officer Constable again attempted to handcuff him. *See id.* at 20:28:55 to 20:29:25. During this second struggle, video footage shows Mr. Bear and Officer Banks moving between Plaintiff, who was now handcuffed on the floor, and his son, who was actively resisting arrest. *See id*. The fact that the Defendant Officers now had to deal with two non-cooperative individuals only further underscores the evolving and increasingly dangerous situation. *See Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (explaining that "the

---

[13]     Plaintiff does not dispute that Karl actively resisted arrest.

number of persons with whom the police officers must contend [with] at one time," is relevant to analyzing the reasonableness of force used in a particular situation); *see also Ference v. Twp. of Hamilton,* 538 F. Supp. 2d 785, 807 (D.N.J. 2008) (observing that the police officer was managing a volatile situation involving several individuals, thus adding "urgency" to the situation). And again, these events all took place in a public area, where Wind Creek patrons could at any point enter or exit the elevators, and thus, be put in harm's way.[14]

To be sure, I recognize that at the summary judgment stage, the facts and evidence are to be viewed in "the light most favorable to the nonmoving party." *Razak*, 951 F.3d at 144. I further recognize that "[t]he reasonableness of the use of force is normally an issue for the jury." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (citing *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)). However, the collective video footage does not support Plaintiff's characterization of the force used against him. Plaintiff repeatedly insists that the Defendants "slammed" his head into the elevator and then onto the floor. *See* Doc. No. 59-1 at 1, 4-6. But Wind Creek surveillance footage shows that Plaintiff's head never made contact with the elevator after he was pulled by Officer Constable or during the ensuing struggle to get his hands behind his back. *See* 55-9 at 20:28:24 to 20:28:32. Moreover, Plaintiff was never lifted into the air and then "slammed" to the

---

[14]    Plaintiff might not have intended to resist arrest and may have indeed been surprised by Officer Banks's initial push. This is particularly true given Plaintiff's intoxicated state. But as stated in footnote 11 above, his subjective intentions are not relevant. The situation must be evaluated from the perspective of a reasonable officer on the scene—not with the benefit of 20/20 hindsight.

Here, Plaintiff and his son failed to cooperate with basic police questions over several minutes, and Plaintiff's son became increasingly antagonistic. Once Officer Banks attempted to arrest Karl, Plaintiff—for whatever reason—placed his arm between the officer and his son, thus prompting Officer Banks to push him away. Plaintiff was then told to place his arms behind his back, but he did not immediately comply. Instead, he turned in the officer's direction and had one arm free as he struggled with the officer. He did not verbally or physically indicate that he was surrendering, meanwhile, his already unruly son began hurling expletives at the officers. In short, a reasonable officer on the scene would have interpreted Plaintiff's actions—intentional or not—as resisting arrest.

ground and was instead pulled toward the floor during his struggle with the two officers and with Mr. Bear.

Consider several examples in which courts have dismissed similar claims of excessive force. In *Durruthy v. Pastor*, 351 F.3d 1080, 1085 (11th Cir. 2003), plaintiff attended a protest in which police officers were attempting to clear the street. When a bystander was being arrested, plaintiff began filming the incident, at which point he was instructed to get out of the street. *See id.* As he stepped away, an officer grabbed him from behind, and then another officer pulled him onto the ground, "while struggling to pin his arms behind him and handcuff him." *Id.* During the struggle, one officer kneed plaintiff in the back, despite plaintiff stating to the officers that his arm was in pain and that he was leaving peacefully. *See id.* On appeal, the Eleventh Circuit overturned the district court's decision, and explained that the police officers were allowed to use some force in effecting plaintiff's arrest, and that in this instance the amount of force used—forcing plaintiff down to the ground and placing him in handcuffs—was *de minimis* and not unlawful. *See id.* at 1094; *see also Myers v. Bowman,* 713 F.3d 1319, 1325-1327 (11th Cir. 2013) (affirming district court's grant of summary judgment to the defendants where videotape footage shows defendants grabbed plaintiff by the arm, pulled him out of his truck, and wrestled him to the ground before applying handcuffs).

In *Brown v. Rinehart*, 325 F. App'x 47 (3d Cir. 2009), the Third Circuit affirmed the district court's grant of summary judgment to the defendant officer against plaintiff's excessive force claim. While on routine patrol, the police officers observed plaintiff, Robert Brown ("Brown"), and several other individuals on a porch. *See id.* at 48. As the officers drove by, Brown began yelling at the officers, who attempted to diffuse the situation by telling him to "calm down" and "relax." *See id.* When this did not work, the officers exited their vehicle to place Brown under

arrest for disorderly conduct. *See id.* at 49. As the officers reached the porch, Brown attempted to run into his home, thus prompting the officers to grab his jacket and to tell him to place his hands behind his back. *See id.* at 49. However, Brown pulled away from the officers and laid on his hands to avoid being handcuffed. *See id.* The officers advised him to stop or that he would be pepper sprayed. *See id.* When he continued to struggle, the defendant officer used his right knee to strike Brown's thigh (i.e., to deliver a "stun blow") *See id.* Brown stopped resisting and was placed in handcuffs. *Id.* The Third Circuit explained that Brown did not materially dispute the above-described actions but instead relied on minor factual inconsistencies, such as whether he was "tackled" or whether an officer "grabbed his coat." *See id.* at 51. This was not enough to overcome summary judgment. Instead, the court of appeals held that "[t]he degree of physical force applied by [the defendant officer] was reasonable because it was proportional to the need for force, especially in light of Brown's active resistance to arrest." *See id.*

In the instant case, the Defendant Officers, together with Mr. Bear, used far less force to subdue Plaintiff. The Defendant Officers did not kick, punch, knee, pepper spray, or otherwise strike Plaintiff at any point. Instead, the officers pushed Plaintiff away, as he interfered with their attempts to arrest his son, and thereafter pulled him to the ground when he did not place his hands behind his back. Contrary to his assertions, the video footage does *not* show his head being "slammed" into the elevator or onto the ground. Rather, the video footage shows that Plaintiff continuously interjected himself into a chaotic situation created by his intoxicated and belligerent adult son. Under these facts, I find that the Defendant Officers are entitled to summary judgment with respect to Plaintiff's Section 1983 claim of excessive force.[15]

---

[15]    Given this holding, I do not reach the Defendant Officer's separate arguments concerning qualified immunity. Moreover, Plaintiff's assault and battery claim against the Defendant Officers also fails. *See Kapepula v. City of Lancaster*, No. CV 22-4741, 2024 WL 4898078, at *3 (E.D. Pa. Nov. 26, 2024) (citing *Boyden v. Twp. of Upper Darby*, 5 F. Supp. 3d 731, 744 (E.D. Pa. 2014) (explaining that the reasonableness of force determines whether the

### B.    Wind Creek's Immunity

As to the remaining assault and battery claim, Wind Creek has moved for summary judgment arguing that it is immune from liability pursuant to 18 Pa.C.S. § 506. *See* Doc. No. 54-1 at 3-7. Specifically, Wind Creek invokes the justification of defense-of-others, "which Pennsylvania courts recognize as a 'complete defense[] to the claim of assault and battery.'" *Leon v. Hanoch*, No. 24CV1060, 2024 WL 3637794, at *6 (E.D. Pa. Aug. 2, 2024) (quoting *Garris v. Thompson*, 1997 WL 11308, at *2 (E.D. Pa. Jan. 10, 1997)). The defense applies when two elements are met—first that the defendant subjectively believes that he or another is in imminent danger of bodily harm, and second, that the belief is objectively reasonable. *See id.* (citation omitted); *see also Smith v. Lauritzen*, 356 F.2d 171, 176 (3d Cir. 1966) ("[T]he defender is privileged to respond only to a reasonable belief on his part that he is in imminent danger of bodily harm."). "In Pennsylvania, self-defense is treated the same in civil cases as it is in the criminal context, … and defense-of-others is applicable when self-defense would be warranted, 18 Pa. Cons. Stat. § 506." *Leon v. Hanoch*, No. 24CV1060, 2025 WL 62806, at *2 (E.D. Pa. Jan. 8, 2025) (citations omitted).

Before addressing the merits of this argument, I first assess—and ultimately reject—Plaintiff's argument that Wind Creek failed to properly raise this defense in its Answer, and thus waived it. *See* Doc. No. 57-1 at 5-6. In his response in opposition, Plaintiff argues that under Pennsylvania law, the failure to plead an affirmative defense results in the waiver of that defense. *See id.* at 5. Specifically, Plaintiff argues that Wind Creek never pled in its Answer, or any other responsive pleading, that it is immune from liability pursuant to 18 Pa.C.S. § 506, and only now raises it for the first time on summary judgment. *See id.* at 6. Because discovery has been

---

police officer's conduct constitutes an assault and battery, and therefore, a claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery).

completed, Plaintiff argues that he can no longer examine the veracity and strength of this claim, and therefore, is prejudiced by Wind Creek's untimely arguments. *See id.*

But there is no merit to Plaintiff's position. As Wind Creek correctly explained, the notice pleading standard used in federal courts "does not require mathematical precision to properly assert an affirmative defense." *See* Doc. No. 63 at 3. "An affirmative defense need not be plausible to survive; it must merely provide fair notice of the issue involved." *Tyco Fire Prods. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 900 (E.D. Pa. 2011) (citation omitted). "Fair notice," in this context, means alerting the adversary to the existence of the issue for trial. *See id.* at 901. "Providing knowledge that the issue exists, not precisely how the issue is implicated under the facts of a given case, is the purpose of requiring averments of affirmative defenses." *Id.*

In this regard, Plaintiff appears to have overlooked several of Wind Creek's affirmative defenses, including those denoted as the Twenty-First, Twenty-Second, Twenty-Third, and Twenty-Fourth defenses. *See* Doc. No. 63 at  3. These read as follows:

### TWENTY-FIRST AFFIRMATIVE DEFENSE

The force utilized was necessitated and reasonable under the circumstances.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff resisted law enforcement direct orders.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff resisted arrest.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff became combative and required subduing by law enforcement to
properly manage the scene.

*See* Doc. No. 38 at 14-15. Although these defenses did not explicitly identify Section 506 of the Pennsylvania Code, or use the term "defense of others," it was sufficiently clear that Wind Creek

intended to argue, as it does now, that the force used against Plaintiff was reasonable under the circumstances because Plaintiff resisted law enforcement and was combative.[16]

Having concluded that Wind Creek did not waive its affirmative defense, I further hold that there is no genuine issue of fact with respect to Mr. Bear's justification in his use of force. During his deposition, Officer Constable specifically testified that Mr. Bear's assistance was necessary because Plaintiff physically resisted arrest. *See* Doc. No. 54-13 at 4. As earlier noted, video surveillance footage supports Officer Constable's testimony and shows that over the course of at least five seconds, the officer struggled to restrain Plaintiff, during this struggle Plaintiff never attempted to place his arms behind his back, and instead, Plaintiff turned in Officer Constable's direction with his right arm free. Plaintiff would later plead guilty to Disorderly Conduct for his actions that evening. *See* Doc. Nos. 55 and 59 at ¶ 38. Mr. Bear's deposition testimony further confirmed that he subjectively believed that responding police officers had a legal basis to effectuate the arrest and to detain Plaintiff and believed that his personal involvement in the arrest became necessary to protect the Defendant Officers and Officer Einfalt from physical harm. *See* 54-9 at 9-10. It was not until Mr. Bear stepped in to assist that he and Officer Constable were able to secure both of Plaintiff's arms to ensure that he could not strike the officer or grab the officer's weapons with his free hand.

---

[16]    I further reject Plaintiff's argument that because Wind Creek failed to explicitly identify the "defense of others" defense, he could not appropriately examine the veracity of the claim. In its Reply, Wind Creek notes that during his deposition, Mr. Bear explained that although the Defendant Officers did not ask him for assistance, he provided help "so no one else would further get injured." *See* Doc. No. 63 at 6. He explained, "[i]f the officer was by himself it could have led to further, to someone getting injured." *See id.*  Wind Creek also noted that during Officer Constable's deposition, he was specifically asked about Mr. Bear's involvement, and he explicitly indicated that given Plaintiff's resistance, he was thankful that Mr. Bear was present on the scene to assist. *See id.* at 5. Given this, Wind Creek argues that if Plaintiff needed clarification, his counsel had ample opportunity to address said concerns during Mr. Bear's deposition and throughout the discovery process. *See id.* at 6. In short, I agree with Wind Creek that Plaintiff cannot now claim that he was surprised by Wind Creek's arguments raised on summary judgment.

Plaintiff seeks to avoid dismissal by again emphasizing that the reasonableness of force used is nearly always a question of fact for the jury. *See* Doc. No. 57-1 at 3. In this regard, Plaintiff repeats many of the same arguments that were already rejected above. He explains that he "never physically threatened any of the officers or Thomas Bear, he often placed his hands behind his back, and repeatedly stated that he wanted he and his son to go back to their room." *See id.* at 4. He also argues that he did not actively (or passively) resist arrest, and was instead slammed to the floor and held down, all while Mr. Bear cranked his arm behind his back and broke it. *See id.* Plaintiff contends that given the situation, which involved three trained police officers and one trained security officer versus one drunk, unarmed man and his "elderly father," the numbers favor Defendants and suggest that the force applied was unreasonable. *See id.* at 5.[17]

Plaintiff is mistaken in several important respects. The video footage does not support Plaintiff's claim that his head was "slammed" into the elevator and then onto the ground. Nor does it support Plaintiff's attempt to minimize the physical struggle between him and Officer Constable, which prompted Mr. Bear to intervene in the first place. While Plaintiff may have held his hands behind his back at various points throughout the video footage, he clearly did not at the most important time, i.e., when he was explicitly told by the officers to place his hands behind his back.

Finally, Plaintiff continues to ignore the elephant in the room—the unruly and dangerous behavior of his adult son. Because Plaintiff's arrest occupied the attention of the Defendant Officers and Mr. Bear, Officer Einfalt was left alone with an increasingly belligerent Karl. During his deposition, Mr. Bear specifically explained that he assisted the officers "so they could then assist with the other family member, Karl Brill as well," and "so no one else would further get

---

[17] Plaintiff does not at any point challenge Wind Creek's assertion that Mr. Bear subjectively believed that the responding officers were in imminent danger of harm.

injured." *See* 54-9 at 9-10. Indeed, the video footage shows that as the officers struggled to arrest Karl, Mr. Bear can be seen moving between Plaintiff, who was handcuffed on the floor, and Karl, who was actively resisting the officers' efforts. *See* Doc. No. 54-10 at 20:28:45 to 20:28:55.

Thomas Bear and Wind Creek, by virtue of their employer/employee relationship, has established that the use of force against Plaintiff was justified and reasonable under the circumstances. Plaintiff's assault and battery claim is dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the pending motions for summary judgement, *see* Doc. Nos. 54-56, are **GRANTED** and judgment is entered in Defendants' favor. An appropriate Order follows.

BY THE COURT:

*s/Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge